[No. 51579-9-I. Division One. July 6, 2004.]

ESTATE OF CYNTHIA BORDON, *Respondent*, v. THE DEPARTMENT
OF CORRECTIONS, *Appellant*.

*Christine O. Gregoire, Attorney General*, and *Glen A. Anderson, Assistant*, for appellant.

*Kevin M. Winters* (of *Hawkes Law Firm, P.S.*), for respondent.

AGID, J. — The Estate of Cynthia Bordon sued the Washington State Department of Corrections (DOC) for Bordon's wrongful death, alleging that DOC negligently supervised Richard Alan Jones and its negligence proximately caused Bordon's death. A jury found in favor of Bordon and apportioned 24 percent of fault to DOC. The State appeals, asserting the trial court erred by denying its Civil Rule 50 motion for judgment as a matter of law based on lack of duty and factual and legal causation. We reverse, concluding the trial court erred by submitting the issue to the jury when there was insufficient evidence establishing cause in fact. We also conclude the trial court did not abuse its discretion when it excluded expert testimony Bordon claims would have established causation because the testimony was outside the witness' expertise and therefore speculative.

## FACTS

On April 11, 1998, Richard Jones and Max Buno drove to a construction site, and Buno loaned Jones his car to pick up sandwiches for lunch. Jones never returned. Approximately five hours later, Jones was driving Buno's car eastbound on State Route 522. He was intoxicated and crossed the center line, colliding with Cynthia Bordon's car. Bordon died as a result of her injuries.

At the time of the accident, DOC was supervising Jones for several crimes. Jones had been convicted of two counts of forgery and two counts of possession of stolen property in the second degree for attempting to use a stolen credit card. On February 23, 1996, Jones was sentenced to 3 months' confinement[1] and 12 months' community supervision for these crimes.[2] He was also ordered to pay $953.92 in court costs and restitution. Upon release from jail, Jones failed twice to report to his DOC supervisor.

---

[1] With credit for time served of 62 days, he was released on February 29, 1996.

[2] There were no conditions imposed on the community supervision.

Within the next several months, Jones was convicted of two more crimes. On October 10, 1996, he was found guilty of second degree burglary for attempting to steal a box of merchandise from the S.S. Bargain Mart in Everett. While out on bond for the burglary charge, he was arrested for eluding police. Jones was convicted of both the burglary and eluding charges, and the court sentenced him for both crimes on the same day. The court sentenced Jones to 20 months' confinement and ordered him to pay $1,548.19 in court costs and restitution for the burglary. He was sentenced to four months' confinement on the eluding charge to run concurrently with the burglary sentence. The court also ordered 12 months' community supervision with a condition that Jones was not to drive unless he was licensed and insured to do so.[3] Because DOC never received a copy of the judgment and sentence for the eluding conviction, it was not supervising Jones on that crime.[4]

Jones finished his prison time on November 14, 1997.[5] As directed by his order of release, Jones reported to his community corrections officer (CCO), Judith Bronson, at the Marysville community corrections office.[6] He was

---

[3] The judgment and sentence states as follows:

*Community supervision conditions: do not drive unless validly licensed & insured. Driving privilege is revoked.*

On December 6, 1996, the Department of Licensing (DOL) revoked Jones' driving privilege for 365 days. This revocation is automatic under RCW 46.61.024, which requires that DOL suspend the license of anyone convicted of eluding a police officer.

[4] There was no copy of the judgment or sentence in the DOC file or in its computerized offender based tracking system (OBTS). DOC Senior Secretary Kathy Sexton and Snohomish County Prosecutor's Office Secretary Janis Duncan testified at trial that the Snohomish County Prosecutor's Office is responsible for providing this information to DOC. Neither party testified that the judgment and sentence was actually delivered to DOC, and Duncan could not recall handling this judgment and sentence. The absence of any reference to the documents in the field file and on OBTS indicated to Sexton that DOC did not receive the documents.

[5] While in prison, Jones had difficulty controlling his behavior and following prison rules. As a result, his scheduled work release was cancelled.

[6] According to her report of her first meeting with Jones, Bronson told him to get a driver's license and she "gave him stuff to take to [the] Depart[ment] of Licensing."

scheduled to return for intake on November 21, 1997, but failed to appear on that day and again on November 25, 1997. His CCO called his home and told his aunt that Jones must appear the following day or she would request a bench warrant. Jones did not report the following day. Bronson drafted a violation report, but she never filed it with the court. Instead, she decided to transfer the case to the Everett Offender Minimum Management Unit (OMMU) because she believed Jones' only obligation on the burglary conviction and his prior theft conviction was to pay his legal financial obligations (LFOs)[7] and she was unaware of the eluding conviction and its accompanying driving condition.[8]

On January 2, 1998, Community Corrections Assistant Shelby Jeffries received her check sheet at the OMMU. It showed that Jones' LFO payment was overdue. Jeffries reviewed Jones' file and decided to try to persuade Jones to report for intake before she filed a violation report.[9] To that end, Jeffries sent a letter to Jones on January 29, 1998, erroneously ordering him to report for intake on *January 9, 1998*. Not surprisingly, he failed to report. She sent a second letter on February 10, 1998, ordering him to report for intake on February 23, 1998, but he again failed to report. On March 3, 1998, the OMMU filed violation reports for Jones' failure to report for intake. On March 19, 1998, the court issued two bench warrants based on the violation reports, and Jones was arrested on March 29, 1998. At the violation hearing, DOC informed the court that Jones violated his burglary and theft supervision requirements by failing to report for intake on four separate occasions, failing to pay his financial obligations, and fail-

---

[7] The accuracy of her belief is unclear. The record suggests Jones' 12-month community supervision sentence on the theft conviction began in March 1996. Jones served approximately seven months of supervision before being arrested for burglary and reincarcerated for that conviction. So it appears that he had approximately five months of active community supervision left when Bronson transferred the case and an additional nine years to pay his LFOs.

[8] The OMMU unit merely monitors payment of LFOs, while the Marysville community corrections office performs active supervision.

[9] This is normal practice in the Everett OMMU field office. It was implemented to reduce the number of violation reports being filed with the court.

ing to provide the OMMU with a valid address. DOC did not tell the court that while he was under OMMU supervision and failing to report for intake, Jones was arrested for driving without a license, which violated a condition of supervision for the eluding conviction.[10] The court found that Jones' failure to pay LFOs and report for intake was willful and ordered Jones to serve 15 days in jail. Jones was released on April 7, 1998, four days before the car accident with Bordon.

The Estate of Cynthia Bordon (Bordon) filed an action against Jones and Buno. Bordon settled with them and entered into a "Stipulation for Partial Payment of Damages and Covenant not to Execute" to preserve joint and several liability between the two defendants and any other defendant they added to the lawsuit. Bordon added DOC by amended complaint on April 3, 2001. DOC filed a motion to dismiss Buno and Jones from the lawsuit on the ground that Bordon had already released them, and the trial court granted the motion. DOC also moved for summary judgment, arguing that, as a matter of law, it did not owe Bordon a duty and even if it did, a breach of that duty did not cause Bordon's death. The trial court denied the motion, and the case went to trial. At the conclusion of the plaintiff's case, DOC moved to dismiss based on lack of duty and/or evidence supporting causation. Specifically, it argued that Bordon presented no competent evidence that Jones would have been in jail when the accident occurred even if DOC had reported the driving violation to the court. It also argued there was no evidence that Jones would have refrained from driving on the day of the accident if DOC had acted differently. The trial court denied the motions.[11] As a result of the motion, however, Bordon abandoned her

---

[10] He was arrested on January 5, 1998.

[11] The trial court expressed concern about the lack of appellate court guidance on the issue of proximate cause, specifically noting that it was unclear whether a plaintiff was required to prove proximate cause in negligent supervision cases. The judge also noted that he did not know how one would prove proximate cause in these cases if it were required. As a consequence, he denied the motion, stating that this case would put the issue "squarely in front of the higher courts."

theory that Jones would not have been driving on the day of the accident if DOC supervised him more closely, relying only on the argument that Jones would have been in jail when the accident occurred.

The jury found in favor of Bordon. It apportioned 24 percent of the fault to DOC and the remaining 76 percent to Jones. Judgment in the amount of $169,051.68 was entered against DOC for its share of fault. It appeals.

## ANALYSIS

 The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to the plaintiff proximately caused by the breach.[12] Whether a duty exists is a question of law that we review de novo, while breach and proximate cause are generally questions for the trier of fact.[13]

### I. Did DOC owe Bordon a duty?

 The State argues that the trial court erred by failing to rule as a matter of law at the conclusion of the plaintiff's case that DOC did not owe Bordon a duty. "In general, an actor 'has no duty to prevent a third person from causing physical injury to another.' "[14] However, a special relationship between the actor and the third party may give rise to a duty if the relationship is " 'definite, established and continuing.' "[15] In *Taggart v. State*,[16] the Washington Supreme Court concluded that there may be a special relationship between third parties and the parolees a community corrections officer supervises. "[W]hen a pa-

---

[12] *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

[13] *Id.*

[14] *Couch v. Dep't of Corr.*, 113 Wn. App. 556, 564, 54 P.3d 197 (2002) (quoting *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992)), *review denied*, 149 Wn.2d 1012 (2003).

[15] *Id.* (quoting *Hertog*, 138 Wn.2d at 276, 288).

[16] *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992).

rolee's criminal history and progress during parole show that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to exercise reasonable care to control the parolee and to prevent him or her from doing such harm."[17]

The parties in this case are arguing two different theories on appeal. The State's argument assumes that because it did not know about the eluding charge, the "take charge" relationship described in *Taggart* did not exist and it had no duty to supervise Jones on the conditions imposed on that conviction. And because the other two charges imposed only LFOs as conditions of supervision, DOC asserts it had no authority, much less a duty, to control Jones' behavior based on those convictions.[18] In contrast, Bordon argues that former RCW 9.94A.120(13) (1996), stating that offenders under supervision will be supervised by DOC, and the sentencing court's order putting Jones on community supervision for three felony convictions impose a duty on DOC. The fact that DOC never received the judgment and sentence on the eluding charge, she argues, does not affect its duty to control the offender's behavior. Because we agree with Bordon that DOC had a duty under *Taggart* arising from the eluding charge, we need not reach the question whether the State also had a duty based on the theft and burglary convictions.[19]

---

[17] *Taggart*, 118 Wn.2d at 220.

[18] The State cites *Couch* (collecting LFOs does not give rise to the kind of take charge relationship that *Taggart* requires because DOC only has authority to collect LFOs). The *Couch* court appears to make a distinction between active supervision and minimal supervision to collect LFOs, noting that the offender in that case had completed his year of community supervision and his only remaining obligation was to pay LFOs. Because we hold that a duty arises from the eluding charge, we do not discuss this distinction.

[19] *Joyce v. Department of Corrections*, 116 Wn. App. 569, 64 P.3d 1266, 75 P.3d 548 (2003), *review granted*, 150 Wn.2d 1032, 84 P.3d 1229 (2004), appears to say that DOC has a duty to supervise an offender's behavior despite its relationship to the underlying crime and in the absence of any court-imposed condition authorizing them to do so. In that case, Division Two concluded DOC had a duty to supervise the offender's driving even though there was no condition authorizing them to do so and the injurious behavior was unrelated to the underlying crimes of assault and

First, the record supports the conclusion that DOC should have known about the eluding conviction and accompanying condition. In his testimony, former CCO and expert witness William Stough stated that based on his experience, the first thing a corrections officer should do is review an offender's file to determine what kind of case he or she has. In his opinion, CCO Bronson did not adequately review the case file and assess Jones' risk.[20] If she had, she would have known about the eluding conviction. He testified that an "X" on the bottom of the judgment and sentence on the burglary charge indicates that there were additional charges of which Jones was convicted and "notes in capital letters that [Jones] also ha[d] a conviction of attempting to elude a pursuing police vehicle." The judgment and sentence for the burglary charge is consistent with this testimony. On the first page, there is an "X" next to a sentence that states, "Other current convictions listed under different cause numbers used in calculating the offender score are . . . ATTEMPTING TO ELUDE A PURSUING POLICE VEHICLE 96-1-01687-4." Stough also testified there were several other records that DOC could have reviewed that indicated Jones was convicted on an eluding charge, including the arrest records, the Federal Bureau of Investigation sheet, and the Washington State Patrol Identification and Conviction Section.

■■ Second, although the condition of supervision on the eluding charge merely stated that Jones was to follow the law that requires a driver to be licensed and insured, the driving condition is sufficient to give rise to a duty under *Taggart* to protect the public from foreseeable behavior associated with that condition. *Taggart* established that DOC has a duty to take reasonable precautions to protect the public from reasonably foreseeable dangers posed by

---

possessing stolen property. *Joyce* seems to expand the holding in *Taggart* by ruling that DOC's duty does not depend on there being a nexus between the offender's crimes and conditions of supervision and the behavior that caused the plaintiff's injury.

[20] He also testified that Bronson should never have transferred the case to the OMMU because Jones violated his conditions by not paying his LFOs. Based on DOC policy, he opined that it is improper to transfer a case that is in violation.

the dangerous propensities of offenders under its supervision.[21] Jones' danger to the driving public would have been foreseeable had DOC known about the conviction and accompanying court-imposed condition ordering Jones not to drive without a license and insurance. Not only is the underlying crime related to driving behavior, but Jones' criminal history shows that he was arrested for driving without a license or with a suspended license 16 times in the nine-year period between 1989 and 1998.[22] He also had an extensive history of driving after drinking[23] and speeding.[24] This history suggests that Jones has shown complete disregard for laws governing drivers, including refraining from driving under the influence. Based on Jones' criminal history and the court-imposed driving condition, Jones was a foreseeable risk to the public when he was driving.[25] Accordingly, DOC had a duty under *Taggart* to protect the public from foreseeable dangers related to that behavior.

We reject DOC's argument that because the court did not impose an absolute prohibition on Jones' driving, it did not intend that the prohibition prevent future harm and DOC had no duty to control Jones' driving behavior. First, the condition that Jones not drive a car without a license and insurance was effectively a no-driving condition for a one-year period in light of RCW 46.61.024.[26] That statute requires DOL to suspend the license of anyone convicted of

---

[21] *Taggart*, 118 Wn.2d at 224.

[22] Ten of those arrests were in 1995. Jones also committed two infractions for driving without insurance in 1995.

[23] He was arrested in Alaska four times in 1989 for driving after drinking or driving while intoxicated (DUI). He was arrested again in Alaska for DUI in 1993.

[24] Jones was arrested eight times between 1987 and 1994 for speeding.

[25] Stough also testified that in his opinion, Jones clearly posed a danger to others, particularly when driving.

[26] RCW 46.61.024 states:

(1) Any driver of a motor vehicle who willfully fails or refuses to immediately bring his vehicle to a stop and who drives his vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony. . . .

. . . .

eluding a police officer. DOL suspended Jones' license on December 6, 1997. The court's decision to impose the condition that Jones not drive without a license and insurance suggests that it was concerned that Jones *would* drive a car despite the revocation. Accordingly, it imposed the driving condition so DOC could monitor Jones' driving and report any violation to the court. Second, the sentencing judge acknowledged this automatic revocation by noting that Jones' "[d]riving privilege [was] revoked" on the judgment and sentence. In light of his criminal history of driving without a valid license, driving under the influence, speeding, and eluding police, DOC's argument that the court did not impose the driving condition to protect people like Bordon from Jones' dangerous propensities is not persuasive.[27]

## II. Evidence of proximate cause.

 There are two elements of proximate cause: legal causation and cause in fact.[28] Proximate cause is generally a question for the jury.[29] But proximate cause may be a question of law for the court if the facts are undisputed, the inferences are plain and inescapable, and reasonable minds could not differ.[30]

---

(3) The license or permit to drive or any nonresident driving privilege of a person convicted of a violation of this section shall be revoked by the department of licensing.

[27] We also reject DOC's argument that because Jones was eligible to get a driver's license at the time of the accident, it did not have a duty to control his driving behavior. Its argument misses the point. Jones did not get a license. DOC was supposed to supervise Jones on the driving condition. The fact that Jones *could have* acted lawfully on the day of the accident is irrelevant as to whether DOC had a duty "to take reasonable precautions to protect anyone who might foreseeably be endangered by [Jones'] dangerous [driving] propensities." *Taggart*, 118 Wn.2d at 224.

[28] *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998).

[29] *Mathers v. Stephens*, 22 Wn.2d 364, 370, 156 P.2d 227 (1945).

[30] *Petersen v. State*, 100 Wn.2d 421, 436, 671 P.2d 230 (1983).

## A. Cause in Fact

There is cause in fact if a plaintiff's injury would not have occurred "but for" the defendant's negligence.[31] Cause in fact does not exist if the connection between an act and the later injury is indirect and speculative.[32] An appellate court reviews de novo a trial court's order denying a CR 50 motion for judgment as a matter of law.[33] Judgment as a matter of law may be granted at the close of the plaintiff's case if the plaintiff has been "fully heard" and "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party . . . ."[34] The reviewing court must "view[ ] conflicting evidence in the light most favorable to the nonmovant party and determine[ ] whether the proffered result is the only reasonable conclusion."[35]

DOC contends the trial court erred by denying its CR 50 motion and submitting the question of proximate cause to the jury. Specifically, it argues that Bordon presented no evidence that Jones would have been in jail on the day of the accident if DOC had filed a report on the driving violations. It also notes that the way in which a plaintiff in a negligent supervision case establishes the requisite causal connection is unclear under Washington case law. In response, Bordon argues that expert testimony establishing causation is not necessary. Citing *Tyner v. Department of Social & Health Services*,[36] she argues a plaintiff is only required to present the relevant facts and it is the jury's role to decide what a reasonable judge would

---

[31] *Walker v. Transamerica Title Ins. Co.*, 65 Wn. App. 399, 403, 828 P.2d 621 (1992).

[32] *Walters v. Hampton*, 14 Wn. App. 548, 555, 543 P.2d 648 (1975).

[33] *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 667, 880 P.2d 988 (1994), *cert. denied*, 513 U.S. 1112 (1995).

[34] CR 50(a)(1).

[35] *Hollmann v. Corcoran*, 89 Wn. App. 323, 331, 949 P.2d 386 (1997) (citing *Forro Precision, Inc. v. Int'l Bus. Machs. Corp.*, 673 F.2d 1045, 1058 (9th Cir. 1982)).

[36] 141 Wn.2d 68, 1 P.3d 1148 (2000).

have done. Even if she were correct, the evidence presented at this trial leaves gaps in the chain of causation such that the conclusion that Jones would have been incarcerated on the day of the accident has to be based on speculation.

Bordon cites to several parts of the record she claims support factual causation, but the testimony she refers to only supports a finding that DOC did not report the driving condition violation to the trial court and "some violations" may be punishable with up to 15 days in jail.[37] Bordon did not present evidence about when a violation report would have been filed or when it would have been heard. She offered no testimony about whether the violation would have been pursued or proved.[38] Nor did she present evidence or testimony, expert or otherwise, suggesting that the court would have sentenced Jones to additional jail time if DOC had reported that Jones violated the driving condition on January 5, 1998, or that the jail time would have encompassed the date of the accident.[39] This lack of evidence requires a jury to guess not only whether and when the violation would have been pursued but also whether a judge would have done something differently if he or she

---

[37] Bordon provides citations to the record without explanation. The following testimony appears on the pages she cites: (1) Stough's testimony that the CCO did not mention Jones' four prior failures to report, his driving violation on January 5, Jones' failure to get a job though he was instructed to do so, and DOC's failure to report the violations before transferring the file; (2) DOC employee Rick Kendo's testimony that had he known about the eluding charge, he would have instructed Jones' CCO to file a violation report and that some violations of supervision conditions are punishable by up to 15 days in jail; and (3) DOC has a duty to enforce the conditions of supervision. None of this evidence establishes that Jones would have been in jail on the day of the accident.

[38] In contrast to parole supervision, under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, a violation report is filed with the prosecutor's office which makes an independent decision about whether to pursue the violation with the court. Bordon presented no evidence establishing that the prosecutor's office would have pursued the violation in this case.

[39] There are a number of factors that may affect the trial court's discretionary decision to impose sentences under the SRA, including the time an offender has already served and overcrowded jails. In this case, determining what a judge would have done is particularly speculative given that Jones had already been punished with 90 days in jail (80 days suspended) for his January 5th arrest for driving without a license.

had known about the violation and what that different result would have been.

We reject Bordon's argument that under *Tyner*,[40] *Estate of Jones v. State*,[41] and *Bell v. State*,[42] evidence that DOC failed to provide the court material information is sufficient by itself to prove factual causation. Those cases are distinguishable because there the plaintiffs presented *some* competent evidence of factual causation that precluded jury speculation.

In *Tyner*, a father who was separated from his children during a child abuse investigation sued the Department of Social and Health Services (DSHS) for negligent investigation. Tyner argued that the negligent investigation and failure to provide material information to the court led directly to its decision to issue the no-contact order. DSHS argued that the court's action was an intervening act that severed the causation chain. Because Tyner presented expert testimony that courts " 'always follow' " social worker's recommendations in dependency proceedings,[43] a jury could have concluded without speculating that DSHS's negligent investigation, which led to its decision to recommend the no-contact order to the court, was the direct cause of the trial court's decision to issue the order. Accordingly, the Supreme Court held that a judge's no-contact order will be an intervening act severing causation only when DSHS provides all material information to the court.[44] *Tyner* does not help Bordon because she presented no testimony about what a court would have done had DOC provided the trial court with all the material information about Jones.

*Estate of Jones v. State* also does not support Bordon's argument. In *Jones*, this court merely reiterated the *Tyner* rule that "the State's failure to provide all material infor-

---

[40] 141 Wn.2d 68.

[41] 107 Wn. App. 510, 15 P.3d 180 (2000), *review denied*, 145 Wn.2d 1025 (2002).

[42] 147 Wn.2d 166, 52 P.3d 503 (2002).

[43] 141 Wn.2d at 87 n.7.

[44] *Id.* at 88.

mation to the court *may be* the proximate cause of injury[,]" and "[w]hether information is material is generally a question of fact for the jury."[45] In that case, the offender was participating in a community placement program when he escaped and murdered Jones. The plaintiff presented evidence at trial that if the State had properly classified the offender, he would have been ineligible for community placement. Unlike our case, the jury in *Jones* did not have to speculate about whether the offender would have been in jail on the day of the murder because it was clear from the evidence that he would not have been released to community placement but for the State's negligence in classifying him.

We also reject Bordon's argument that *Bell v. State*[46] supports her contention that no expert testimony is required to send the issue of proximate cause to the jury. In *Bell*, a victim of kidnapping and rape sued the State for negligently supervising sex offender Byron Scherf. At trial, Bell offered expert testimony that Scherf committed parole violations that were not reported and that based on Scherf's history, his CCOs should have recommended his parole be revoked. The State offered evidence that Scherf was in substantial compliance with his parole conditions and some of his questionable sexual behavior was reported to the Indeterminate Sentence Review Board, which exercised its discretion and decided not to hold a revocation hearing. The trial court submitted the issue to the jury, which found in favor of the State because Bell had not proved that the State's negligence caused her injuries. The *Bell* court was not reviewing a CR 50 motion, so it did not need to address the propriety of sending the issue to the jury, what evidence is necessary to establish probable cause, or whether expert testimony is required. Its application to this case is thus extremely limited.

We hold that some evidence of a direct link between DOC's negligence and the harm to a third party is neces-

---

[45] *Jones*, 107 Wn. App. at 519 (emphasis added).

[46] 147 Wn.2d 166.

sary to survive a CR 50 motion in negligent supervision cases. In previous cases, the nature of that evidence has varied. It has included expert testimony about how judges rule in particular proceedings,[47] factual evidence that the very nature of the negligence led to an offender's release,[48] testimony of the sentencing judge,[49] or expert testimony that the State's negligence directly caused the injury.[50] Causation evidence could also include statistical evidence about what judges do in similar cases. While we agree that expert testimony is not always required, *some* evidence establishing causation must be presented to survive a CR 50 motion. That evidence must allow a jury to determine causation without resorting to speculation.

In sum, we reverse because Bordon did not present any evidence establishing a direct causal connection between DOC's negligence and Bordon's death. The trial court thus erred when it denied the State's motion for a judgment as a matter of law at the conclusion of Bordon's case.

## B. Excluded Expert Testimony

 Evidentiary rulings are reviewed for an abuse of discretion.[51] A court abuses its discretion when its decision is manifestly unreasonable or based on untenable

---

[47] *Tyner*, 141 Wn.2d at 87 n.7 (expert testimony that courts "always follow" *social workers' recommendations in dependency hearings*).

[48] *Estate of Jones*, 107 Wn. App. 510 (the offender would not have been eligible for release to community supervision if DOC was not negligent in classifying him).

[49] *Petersen*, 100 Wn.2d at 442 (sentencing judge responded to the hypothetical questions about how he would have ruled in certain situations).

[50] *Joyce v. Dep't of Corr.*, 116 Wn. App. 569, 64 P.3d 1266, 75 P.3d 548 (2003) (expert testimony that the offender would have been in prison but for the violations). We note that in *Joyce*, William Stough, the same expert witness who testified here, presented the testimony that established causation. Division Two concluded that the trial court did not abuse its discretion by admitting Stough's testimony about how courts treat violation reports. We do not know the circumstances under which the testimony was admitted in *Joyce*, but we conclude below that based on the record in this case, the trial court did not abuse its discretion by refusing to admit Stough's testimony.

[51] *Blomster v. Nordstrom, Inc.*, 103 Wn. App. 252, 259, 11 P.3d 883 (2000).

grounds.[52] Bordon argues that even if we conclude that she did not establish the requisite causation, we should remand for a new trial on that issue. She asserts the trial court abused its discretion when it granted DOC's motion in limine to exclude portions of Stough's testimony that would have established causation, including testimony about what a judge might have done at the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, violation hearing and his opinion that Jones would not have been driving on the day of the accident had he been more closely supervised.[53] We disagree for two reasons. First, Bordon did not make an adequate offer of proof to the trial court. Bordon stated she sought to elicit testimony that

> the purpose of supervision is to let the offender know that they have to follow the conditions of the court and the rules of the Department. And if they don't do so, there will be consequences. So if those consequences change behavior, great. If they don't, there are consequences. . . .[54]

In arguing the motion in limine, Bordon indicated she did not want Stough to testify about what a judge would do[55]

---

[52] *Id.*

[53] Bordon argues in her brief that she sought to elicit testimony from Stough similar to that in his declaration where he said:

Based on [his] experience with supervision, with supervising CCO's, and with dealing with the Court first-hand on these matters, it is [his] considered opinion that on a more probable than not basis, had the Department adequately and reasonably informed the Court of Jones' violations and difficulty adjusting to supervision at [the] hearing on April 6, 1998, Jones would have been sentenced to well over 60 days in jail. At the very least, Jones would have been sentenced to more than 15 days in jail, and he would have been in custody on April 11, 1998 when he committed vehicular homicide against Cynthia Bordon.

Moreover, had the department timely and effectively responded to Jones' violations when he absconded, then it is more likely than not that Jones would have recognized the need to comply with his supervision and done so. That is the whole point of supervision. Offenders who see that the Department will monitor and enforce the conditions of supervision tend to comply with these conditions. Had Jones been in compliance on April 11, 1998, he would not have been driving recklessly or been driving at all.

[54] The trial court allowed Bordon to present this testimony but she never did so.

[55] The trial judge stated, "He's not going to be testifying as to what a judge would do." Bordon's counsel responded, "I don't want him to."

nor did she intend to elicit testimony that Jones would have not been driving on the day of the accident had he been more closely supervised. And because Bordon represented to the court that she never intended to present this evidence, she did not make an offer of proof about what the testimony would have been and the legal basis for its admissibility.[56] An offer of proof " 'informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record for adequate review.' "[57] But the portions of the record Bordon cites in her appellate brief do not articulate the legal and factual bases upon which Stough is qualified to offer opinions about what a judge would normally do in SRA violation hearings. Nor do they contain any legal argument about why Stough should be permitted to testify that closer supervision would have resulted in greater compliance on Jones' part.[58]

Second, despite the problems with her argument at trial, we are able to determine from the record that the trial court did not abuse its discretion. The trial court concluded that any testimony about what a judge would do at a sanction hearing would be speculative at best. Stough is not a judge, he has never supervised an SRA offender, nor has he ever attended an SRA violation hearing.[59] The trial court was thus well within its discretion when it refused to allow Stough to testify about what a judge would have done in the SRA violation hearing if the CCO had reported Jones' driving condition violation to the court. This testimony

---

[56] ER 103(a)(2).

[57] *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 26, 864 P.2d 921 (1993) (quoting *State v. Ray*, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991)).

[58] *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 103.18, at 67 (1995) (an appellate court will generally not consider an alleged error unless there was a timely and specific argument in the record that the evidence ought to be admitted) (citing *State v. Jordan*, 39 Wn. App. 530, 694 P.2d 47 (1985), *review denied*, 106 Wn.2d 1011 (1986), *cert. denied*, 479 U.S. 1039 (1987)).

[59] Stough last supervised an offender case load at DOC in 1973, more than a decade before the SRA was implemented.

would clearly have been beyond his expertise and merely speculative. Similarly, the trial court's decision to prohibit Stough from testifying that Jones would not have been driving on the day of the accident if DOC supervised him more closely was not an abuse of discretion. Stough had never spoken with Jones, so he had no factual basis to form an opinion on the issue. Nor were there any studies or reports offered supporting the theory that increased supervision leads to lower recidivism. Finally, even if we concluded that the trial court should have admitted Stough's testimony, it would have been insufficient to establish cause in fact because Bordon stated she never intended to elicit testimony at trial about "what a judge would do." Under the facts of this case, that kind of evidence is precisely what would have been necessary to establish causation.

We reverse.

APPELWICK and SCHINDLER, JJ., concur.

Review denied at 154 Wn.2d 1003 (2005).